THE COUNTY OF HUDSON, ALFRED J. PAKENHAM AND MARIE A. PAKENHAM, PROSECUTORS, v. STATE HOUSE COMMISSION, HOMER C. ZINK, SECRETARY OF SAID COMMISSION, AND AUTOMATIC VOTING MACHINE CORPORATION OF JAMESTOWN, NEW YORK, DEFENDANTS.

Submitted January 19, 1943—Decided April 30, 1943.

Before Justices CASE and DONGES.

For the prosecutors of the writ, *J. Emil Walscheid*.

For the defendants State House Commission and Homer C. Zink, secretary of said· Commission, *Homer C. Zink*.

The opinion of the court was delivered by

CASE, J.   The writ of *certiorari* brings up a resolution adopted by the State House Commission on August 4th, 1942,

awarding a contract to Automatic Voting Machine Corporation, for voting machines to be delivered to the superintendent of elections of Hudson County in accordance with the company's proposal, paragraphs 1 and 2 of which were as follows:

"1. As many machines, not more than 350, on or before October 1st, 1942, as and when ten per cent. of all subventions due to the County of Hudson, State of New Jersey, excepting School and Relief Funds, will permit you to pay 100% of the purchase price per machine upon delivery; and further deliveries will be made on these terms as rapidly as available funds accumulate, and as long as the remainder of these 350 machines are still available for purchase by you. Provided, however, that you shall not be required to pay more than $300,000 in any one year on account of such purchase price.

"2. As many machines, not more than 850, within six months after the conclusion of the present War, as and when ten per cent. of all subventions due to the County of Hudson, State of New Jersey, excepting School and Relief Funds, available therefor will permit you to pay 100% of the purchase price per machine upon delivery. Provided, however, that you shall not be required to pay more than $300,000 in any one year on account of such purchase price."

The award was the culmination of various proceedings under *R. S.* 19:48-3, as amended by chapter 197, *Pamph. L.* 1940, which provided:

"* * * In all counties of the first class on and after September first, one thousand nine hundred and forty, voting machines of the type to meet the requirements of this subtitle shall be adopted and furnished by rental or purchase, by the board of chosen freeholders and used at all elections, in all election districts, in said counties; provided, however, that the purchase price of voting machines shall be paid at a rate not to exceed three hundred thousand dollars ($300,000) in any one year. In the event the board of chosen freeholders of any county of the first class shall not have furnished and provided by rental or purchase at least forty (40) days before the election immediately following the enactment of this act, voting machines of the description and in the quantity

required for use as aforesaid then the State House Commission shall forthwith furnish, by purchase or rental, a sufficient number of voting machines for use at all elections in all election districts in said county; in the event that the State House Commission finds it impracticable to obtain the number of machines necessary for use in all election districts in the said county at the next election, the State House Commission shall furnish as many machines for use in the said county at the next election as it finds practicable * * *.

"* * * The cost of the rental or purchase of voting machines by the State House Commision under the provisions of this section shall be paid as follows: The State Treasurer shall withhold ten per centum (10%) of all subventions, excepting school and relief funds, due said county in any fiscal year until sufficient funds, together with interest at the rate of three per centum (3%) per annum, on the unpaid balance has been withheld, to cover the cost of the purchase or rental of the voting machines. The State Treasurer shall disburse said funds so retained to such persons or corporations, public or private, as shall be entitled to the same."

The legislature had by earlier legislation (chapter 302, *Pamph. L.* 1935) authorized the adoption of voting machines either by action of the board of chosen freeholders of a county or of the governing body of a municipality or by referendum vote throughout a county or a municipality. Some of the counties, including the County of Essex, adopted the machine method of voting and purchased the machines. Later (September 24th, 1940) the legislature enacted chapter 197, *Pamph. L.* 1940, the amended *R. S.* 19:48-3, *supra,* which made mandatory thereafter the use of voting machines in counties of the first class. The statute further directed that if the board of chosen freeholders of a first class county did not provide such machines the State House Commission should proceed to do so for the use of the county. The Board of Chosen Freeholders of the County of Hudson did not obey the statute. On the continuation of that default the State House Commission acted.

The first and second points presented by prosecutors are to the effect that chapter 197, Laws 1940, is a local and special

law regulating the internal affairs of towns and counties and therefore runs counter to article IV, section VII, paragraph 11 of the constitution. The purpose of the statute is to provide for honest elections—a matter of importance to the people of the whole state. It is of common knowledge that in sparsely-settled districts there is not the need for that vigilance, supervision and regulation that are required in densely-populated municipalities. Consequently, where a necessity arises to add to the machinery of government in certain localities for the purpose of attaining purity in general elections, it is within the legislative power to supply such machinery to those localities without burdening other localities, which are not in need of it, with the expense thereof. The legislature was the sole judge whether the necessity for mandatory legislation existed in first class counties by reason of their crowded districts and large population, and its decision in that regard is not open to question. The statute is not one which merely regulates the internal affairs of the counties in which the act is made operative. *McDonald* v. *Board of Freeholders of Hudson,* 99 *N. J. L.* 393. The fact that Hudson and Essex are the only first class counties and that compliance by Essex left Hudson as the only county to be affected, does not alter the principle.

The further argument is made that the method of payment provided by the statute and the resolution contravene article IV, section VI, paragraph 4 of the constitution which provides that "The legislature shall not in any manner, create any debt or debts, liability or liabilities, of the state, which shall singly or in the aggregate, with any previous debts or liabilities at any time exceed one hundred thousand dollars * * * and no such law shall take effect until it shall, at a general election, have been submitted to the people, and have received the sanction of a majority of all votes cast for and against it at such election; * * *;" and the case of *Wilson, Attorney-General,* v. *State Water Supply Commission,* 84 *N. J. Eq.* 150, is cited in support.

The decision of the Court of Errors and Appeals in the cited case, as we understand it, went upon the theory that the land which the State Water Supply Commission under-

took to purchase was to become state property; that the purchase price amounting to $1,000,000 was to be met by setting up a mortgage debt upon the lands; that the debt was a debt of the state; that whether or not the debt thus incurred on behalf of the state was to be collected from a particular fund or even if it was not an enforceable debt was beside the point, as it was nevertheless a debt of the state and the prohibition of the constitution therefore ran against it; that contributing appropriations from the state treasury were anticipated and that the appropriations so to be made would clearly be in payment of the debt. Upon these considerations the court concluded that the contract created an indebtedness in violation of the constitutional provision.

If the property now proposed to be purchased were to be state property, and if the State House Commission were an agency selected to make the purchase for the state and if, further, it were within the scope of the statute or of the resolution that the state would appropriate moneys toward the payment of the property thus to be purchased, the Water Supply Commission decision would clearly be pertinent. All of those conditions do not exist. The voting machines are not, under our construction, to be the property of the state, either in form or substance; they are bought for the use of and will be the property of the County of Hudson and will be in the custody of the appropriate officers of that county. The State House Commission, as an agency for purchase, acts for the county under authority from the state. In theory, the machines are to be paid for from moneys that have been saved from or that shall have been saved from funds which would otherwise go to the County of Hudson for other uses of that county—"subventions" according to the statutory phraseology.

The statute does not define "subventions" and the word is not one of such ordinary statutory use as to carry an unmistakable meaning. The dictionary definition of "subvention" (Webster's New International, second edition) is: "2. Pecuniary aid; a grant or appropriation of money; endowment; esp., a subsidy from a government or foundation." This definition, supplemented by the statutory exclusion of

school and relief funds, leads us to conclude that the legislature intended the cost of the purchase to be paid from the share of Hudson County in subsidies that are akin to the state aid given for schools and relief, but excluding those specific appropriations. Subsidies that bear similitude to those for schools and relief, and are granted, like them, in the annual appropriation bill, are the items of aid to the county insane hospitals and the county tuberculosis hospitals In the abstract we see no constitutional objection to the diverting of a portion of such subsidies to the purchase of voting machines provided such diversion is consistent with the provisions of the statute which appropriates the subsidies; but the concrete facts of the case present difficulties which we shall discuss under the next point.

The fourth and last contention of prosecutors is that the resolution of award is void because no moneys have been appropriated for the purchase of the machines. We think that the point is well made.

The statute directing the retention of a percentage of the several Hudson County subsidies from state funds to be used in buying the voting equipment was passed by the legislature of 1940. But the only existing subventions, when the State House Commission made the award on August 4th, 1942, were such as were appropriated by the legislature of 1942. The last named legislature, on March 30th, 1942, passed the annual Appropriation Act, chapter 29, *Pamph. L.* 1942, effective July 1st, 1942, and in that statute created two subventions in favor of Hudson County, namely, in section 1, paragraph X5 to the County of Hudson for the support of patients pursuant to *R. S.* 30:4-78 in county insane hospitals $340,000 and in section 1 X6 to the County of Hudson for the support of patients pursuant to subdivision C, article 4, chapter 9 of title 30 of the Revised Statutes in re county tuberculosis hospitals $180,000. But the 1942 legislature inserted, in the appropriation statute, this provision (section 4): "No money shall be drawn from the treasury except for objects as hereinabove specifically appropriated, and except such sums as may be required to refund amounts credited to the State Treasurer which do not represent state revenues,

and except such sums which are by law devoted to specific purposes, namely, * * *" (here follows a list of exceptions which do not include the items under discussion). May any part of subsidies so given by the 1942 legislature for the benefit of insane hospitals, or of tuberculosis hospitals, be diverted, under a statute passed in an earlier year, to a wholly alien use? We think not. The only response made by the defendants to the argument is that "it is settled that subventions to the counties are no longer state moneys;" and that, we think, even assuming its correctness, is not an answer to the contention that the 1940 legislature may not, in advance, divert to one use money which the 1942 legislature, in appropriating, directs shall go to another. By chapter 46, *Pamph. L.* 1942, the legislature of that year made further distribution of moneys to the counties for the construction and repair of roads, but this, if it may be included as one of the subventions, is subject to the same limitation; and by this we mean, not that the statute contained a specific provision that the appropriation should not be applied to another use, but that the appropriation was made for a named purpose which was not the purchase of voting machines.

May the authorizing statute of 1940 and the appropriating acts of 1942 be said to be *in pari materia,* a legislative program on the same subject-matter, with the result that the later statutes shall be made to yield where they are in conflict with the uniform plan? The answer, it seems to us, is no. The general Appropriation Act of 1942 is quite too pointed in its command that no money shall be drawn from the treasury except for the purposes therein specified. There can, we believe, be no doubt that the legislature meant the moneys there appropriated to go to the named purposes and not otherwise. The statute distributing road moneys does not contain a specific exclusion, but we discern no intention that the moneys there disbursed may be used, not for the construction and repair of roads, as the statute directs, but for the purchase of voting machines. Further, the 1940 statute did not establish a fund for the purchase of voting machines and set over to it a percentage of all, or any, of the subventions then existing or later to be created. Nothing so tangible

as that confronted the legislatures of 1941 and 1942. The provision as to retained subsidies was not to be given life until two conditions precedent had occurred, one negative, the other positive; first, that the affected county did not make its own provision; second, that, the county failing to act, the State House Commission did. Notwithstanding the mandatory expressions in the statute, there was no assurance of either eventuality. The statute, passed September 24th, 1940, ordered the County Board to procure the machines, but in the event that the Board did not do so at least forty days before the next election—the November election of that year—then the State House Commission should "forthwith" furnish the same. There was at no time compliance by the County Board and the State House Commission did not pass its resolution of acquisition until August 4th, 1942. This carries no suggestion that there was faulty inaction by the Commission. It goes merely to the question of whether the statute of 1940, after an ensuing period wherein two fiscal years elapsed without the impact of the "subvention" deductions upon state appropriations, may be said to have been so much a part of the 1942 appropriation scheme as to divert the funds of the latter year to purposes other than those ordered by the 1942 legislature in making the appropriations. We have already stated our view to the contrary.

Indeed, we consider that the 1940 statute was not *in pari materia* with the appropriating acts of 1942. They relate to entirely different subject-matters. The former was concerned only with voting machines; the latter were concerned not at all with voting machines. Without the benefit of that principle of construction the 1940 legislation was in conflict with the 1942 Appropriation Acts and must yield to them.

It follows, therefore, that the resolution awarding the contract was adopted without an appropriation to meet the costs; certainly without an effective allocation of Hudson County funds from which the expense would be paid. Thus, the theory upon which the award was made and upon which, before us, it is sought to be sustained falls.

The total number of machines embraced within the award is 850. The price per machine is $1,121 plus $11.29 freight

and drayage charges, a total on the entire award of $962,446.50; and there is a provision that no more than $300,000 in any one year will be called for payment. If, as we are given by the defendants clearly to understand, and as we believe the fact to be, the award was intended to be and is dependent upon and payable only from available moneys of the County of Hudson, in the hands of the State Treasurer, there were no such moneys when the award was made and there appear to be none now. If, however—and this seems to be the only alternative—the obligation in some way involves the credit of the state, the award is in violation of article IV, section VI, paragraph 4 of the constitution, *supra,* because there was and is no cash appropriation and the purchase may be accomplished only by creating a liability beyond the permissible constitutional figures.

The resolution under review will be annulled; without costs.